1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JOHN JOHNSON,                           No. CIV S-09-3395-CMK

12              Plaintiff,

13        vs.                                 MEMORANDUM OPINION AND ORDER

14   COMMISSIONER OF SOCIAL
     SECURITY,

15              Defendant.

16   _____/

17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21   judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending

22   before the court are plaintiff's motion for summary judgment (Doc. 20) and defendant's cross-

23   motion for summary judgment (Doc. 26).

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on December 30, 2005.  In the application, plaintiff claims that disability began on December 1, 2005.  Plaintiff claims that disability is caused by a combination of "obstructive airway disease, asthma, a football size hernia, lipomas, low-average to borderline intellectual functioning, and obesity" which causes "debilitating symptoms including pain, fatigue, shortness of breath, difficulty reading and writing, and moderate limitations in concentration, persistence, and pace."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on February 11, 2008, before Administrative Law Judge ("ALJ") Sandra K. Rogers.   In a July 23, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairments: asthma, unrepaired abdominal hernia, an low-average to borderline intellectual functioning;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the residual functional capacity to perform the full range of light work; and

4. Considering the claimant's age, education, work experience, and residual functional capacity, [the Medical-Vocational Guidelines direct a conclusion that] there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on October 8, 2009, this appeal followed.


# II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

January 28, 2006 – Plaintiff completed a Daily Activities Questionnaire.  Plaintiff stated that he could only walk for extremely short distances before tiring and that he requires use of a cane.  He also stated that he cannot lift anything heavier than five pounds.  According to

plaintiff, he does no house cleaning, laundry, or yard work.  He does not drive a car.  Plaintiff stated that he sleeps at most three hours and that has gone several days without being able to sleep at all.

February 22, 2006 – Agency examining psychologist James A. Wakefield, Jr., performed a psychodiagnostic evaluation of plaintiff.  Dr. Wakefield recited the following background history:

> John is a 45-year-old man who reports respiratory problems, asthma, and a hernia.  No medical or school records were available for review.
>
> John reports that he lives with his sister and niece.  He spends the day "trying to get air."  It is hard for him to breathe, and he takes Albuterol, Asmacort, and Proventil.  He has trouble sleeping at night.  John went to school to the 12th grade and attended remedial classes in high school.  He used to go fishing but cannot go anymore due to his breathing machine.  His last job was mowing a lawn a few years ago.

The doctor administered a number of psychological tests and reported the following summary and recommendations:

> John is an anxious, immature-behaving 45-year-old man who reports respiratory problems, asthma, and a hernia.  His intellectual ability was measured in the deficient range, although some characteristics of his responses suggest malingering.  Also, his breathing treatment during the session appeared to be more for the examiner's benefit than in response to respiratory distress during the session, although the breathing machine may actually be needed at other times.  Since no record showing a developmental disability during childhood was available, borderline intellectual functioning is provisionally diagnosed.  Medical and school records would be helpful for clarifying this case.

Dr. Wakefield gave an Axis I diagnosis of malingering and assigned a global assessment of functioning ("GAF") score of 65 out of 100.  The doctor continued his impressions as follows:

> John presents himself as not able to handle money, although stronger ability in this area is suspected.  His appearance is adequate.  John can follow simple work rules, although his ability to complete more complicated procedures is uncertain due to reduced effort.  John is able to interact with co-workers, supervisors, and the public at a minimally acceptable level.  He is able to sit, stand, walk, move about, handle objects, hear, speak, and travel adequately.  John's ability to reason and

make occupational, personal, and social decisions in his best interest is presented as deficient.  His social and behavioral functioning are immature.  John's concentration, persistence, and pace are deficient.

March 1, 2006 – Diagnostic imaging was performed incident to complaints of abdominal pain.  The imaging showed a "questionable mild herniation lateral to the right side of the abdominal wall."  No acute abnormality was noted.

June 22, 2006 – Agency examining doctor Philip Seu, M.D., performed a comprehensive internal medicine evaluation of plaintiff.  Dr. Seu noted the following history:

1.      Asthma: The claimant states that he has had asthma since age 15.  He has shortness of breath daily.  He is on several different medications as well as Albuterol nebulizer, which he uses to treat his symptoms.  He states this can occur at rest, exacerbated by physical exertion such as walking about half a block.  He reports that he cannot sleep flat.  He sleeps upright in a chair and he wakes up several times during the night.  He had to go to the emergency room several times this year and most recently 3-4 weeks ago.  He has never been hospitalized for asthma attacks.

2.      Abdominal hernia: The claimant developed an abdominal wall hernia approximately 14 years ago and [it] has progressively increased in size.  It is now approximately the size of a football.  The hernia is through a previous right lower quadrant appendectomy incision.  He complains of pain from the hernia. . . .

As to daily activities, plaintiff reported that he stays inside most of the time due to chronic shortness of breath.  On physical examination, Dr. Seu noted plaintiff's weight at 242 pounds.  The doctor observed wheezing in the left base lobe of the lungs.  Plaintiff's incision hernia was soft and non-tender.  Plaintiff used no assistive devices.  The doctor diagnosed "[s]evere asthma" and a "[m]assive incisional abdominal wall hernia."  Dr. Seu provided the following functional assessment:

The number of hours the claimant should be able to stand or walk in an eight-hour workday is about six hours with hourly breaks.  This limitation is due to asthma as well [as] a large abdominal hernia.

The number of hours the claimant should be able to sit in an eight-hour day is six hours.

Assistive device: The claimant does not require any assistive device for ambulation mobility.

4

1   The amount of weight the claimant could lift and carry is 10 pounds
2   frequently and 20 pounds occasionally due to a large abdominal hernia as
    well as asthma.

3   There are no postural limitations on bending, stooping, or crouching.

4   There are no manipulative limitations on reaching, handling, feeling,
    grasping, and fingering.

5
6   There are no relevant visual, communicative, or workplace environmental
    limitations.

7   <u>July 19, 2006</u> – Agency examining doctor N.J. Kravatz, M.D., completed a

8   Psychiatric Review Technique Form with accompanying Mental Residual Functional Capacity

9   Assessment. The doctor concluded that plaintiff has borderline intellectual functioning, but that

10  the condition does not precisely satisfy the criteria for an impairment listed in the regulations.

11  The doctor found mild limitations in plaintiff's activities of daily living and ability to maintain

12  social functioning. Moderate limitation was found with respect to maintaining concentration,

13  persistence, and pace. No episodes of decompensation were noted. As to plaintiff's abilities in

14  the categories of understanding and memory, sustained concentration and persistence, social

15  interaction, and adaptation, no marked limitations were noted. Any limitations in these

16  categories were not significant, except for the following areas where the doctor noted moderate

17  limitation: ability to understand and remember detailed instructions, ability to carry out detailed

18  instructions, ability to maintain attention and concentration for extended periods of time, ability

19  to complete a normal workday without interruptions caused by psychological symptoms, and

20  ability to accept instructions and respond appropriately to supervisors. Dr. Kravatz offered the

21  following functional assessment in light of the noted limitations:

22  A. Clmt appears capable of performing simple, routine and repetitive
    tasks that do not require literacy. Would experience difficulty with
23  detailed and complex tasks.

24  B. Clmt can sustain [concentration, persistence, and pace] for up to 2-hour
    increments.

25
26  C. Clmt may have mild difficulties interacting with co-workers,
    supervisors and the public.

5

1        D.  Capable of adapting to a competitive environment.

2        <u>November 15, 2006</u> – Agency consultative doctor S.K. Clancey, M.D., completed

3    a Physical Residual Functional Capacity Assessment.  The doctor opined that plaintiff can

4    lift/carry 20 pounds occasionally and 10 pounds frequently, can sit/stand/walk for six hours in an

5    8-hour day, and push/pull without limitation.  Plaintiff can engage in postural activities

6    occasionally.  No visual, manipulative, or communicative limitations were noted.  The doctor

7    did, however, opine that plaintiff should avoid even moderate exposure to fumes, odors, dusts,

8    etc.  Otherwise, no environmental limitations were noted.

9        <u>March 26, 2008</u> – Agency examining psychologist John A. Chellsen, Ph.D.,

10   performed an evaluation of plaintiff.  Plaintiff reported to the doctor that he graduated from high

11   school in regular classes and acquired a low-average degree of academic proficiency.  As to daily

12   activities, plaintiff reported that he spends his day at home, visiting an elderly neighbor, and

13   doing odd jobs.  Based on a clinical interview, Dr. Chellsen reported the following:

> John is a white male of medium height and moderately obese stature who
> was casually attired and adequately groomed.  His physical appearance
> was notable for having an egg-shaped, dysmorphic appearing body.  He
> walked with an ambling gait and showed no postural abnormalities.  He
> interacted in a pleasant and cooperative fashion.  He drove himself to the
> office in his father's car and arrived on time.  His primary complaints are
> somatic in nature.  He was uncertain why he had been referred for a mental
> exam.  He spoke in a normal rate and volume, with good articulation.  He
> described his usual mood in moderately positive terms.  His affective
> expression was mobile in range, superficial in intensity, and appropriate to
> content.  His associations were intact, linear, and coherent.  His thought
> content was benign and well-grounded in conventional reality.  He was
> accurately oriented in all three spheres (time, place, and person).  His
> memory and span of attention and concentration appear to fall in the low-
> average range.  His judgment is intact, and there are no apparent problems
> with impulse control.  He denied ever experiencing a clinically significant
> level of anxiety or depression.  He did not appear to be in any apparent
> distress during the evaluation.  There is no evidence that he has ever
> experienced any hallucinatory phenomena or delusional or suicidal
> ideation.  His capacity to tolerate frustration appears to be unimpaired.  He
> denied the presence of any obsessions, compulsions, or phobias.  He has
> no prior history of contact with mental health professionals for treatment.

26   / / /

As to plaintiff's capabilities and limitations, Dr. Chellsen offered the following assessment:

> John appears to have mild social and personal and moderate occupational limitations, strictly from a psychological point of view.  He appears to have functioned in a marginal and withdrawn fashion for many years.  He has a significant degree of constriction in his range of activities and interests.  His social skills are pro-social in nature but significantly under-developed.  The prognosis for significant change in his functioning is guarded.  His task performance was characterized by good persistence and borderline to low-average pace and quality.  His limited energy and capacity for exertion appear to be the primary factors which impair his ability to tolerate or adapt to usual work stressors or routines.  He does appear to be basically competent to manage funds in his own behalf.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

**IV.  DISCUSSION**

In his motion for summary judgment, plaintiff argues: (1) the ALJ rejected the opinions of Drs. Seu and Chellsen without providing sufficient reasons for doing so; (2) the ALJ failed to properly evaluate plaintiff's obesity; (3) the ALJ's residual functional capacity finding failed to reflect limitations which the ALJ accepted; and (4) the ALJ erred in applying the Grids given plaintiff's non-exertional limitations.[1]

A.    **Evaluation of Medical Opinions**

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

---

[1]      As will be seen, it is not necessary to address plaintiff's additional argument that the ALJ mischaracterized the medical evidence.

1  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

2  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

3  the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

4  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

5  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

6  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

7  without other evidence, is insufficient to reject the opinion of a treating or examining

8  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

9  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

10  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

11  see also Magallanes, 881 F.2d at 751.

12          Plaintiff argues that the ALJ rejected limitations expressed by Drs. Seu and

13  Chellsen without providing sufficient reasons for doing so.  As to Dr. Seu, plaintiff claims:

14              In summarizing Dr. Seu's assessed limitations, the ALJ omitted his
               opinion that Mr. Johnson could stand or walk for six hours in an eight-
15             hour day *with hourly breaks*.  TR 203.  The need for hourly breaks was an
               important limitation since it exceeded the workday norm.  (italics in
16             original).

17  As to Dr. Chellsen, plaintiff claims:

18              . . . Although the ALJ appeared to adopt the limitations assessed by
               Dr. Chellsen, she tacitly rejected his opinion without articulating specific
19             or legitimate reasons for doing so as required by law.

20      1.      Dr. Seu

21  Regarding Dr. Seu's assessment, the ALJ stated:

22      At the request of the State agency the claimant underwent a consultative
        examination on June 22, 2006, conducted by Philip Seu, M.D.  After a
23      thorough examination and evaluation, Dr. Seu diagnosed the claimant with
        severe asthma and what he observed to be a "massive incisional abdominal
24      hernia."  Considering these impairments, Dr. Seu stated that the claimant
        should be able to sit, stand, or walk up to six hours each during an eight-
25      hour workday, lift and/or carry 20 pounds occasionally, 10 pounds
        frequently, with no postural, manipulative, visual, communicative, or
26      workplace environmental limitations [Exhibit 3F].

9

1    The ALJ then stated that she found Dr. Seu's diagnosis of severe asthma to be consistent with the

2    other medical evidence of record.  As plaintiff correctly notes, none of the ALJ's discussion of

3    the medical opinions references Dr. Seu's opinion that plaintiff required hourly breaks from

4    standing or walking due to plaintiff's asthma and hernia.

5              In response to plaintiff's argument, defendant asserts:

6                        . . . In regard to Dr. Seu's opinion, Plaintiff claims error because
     the ALJ did not accept Dr. Seu's belief that Plaintiff should have hourly
7              breaks in standing and walking. . . . [T]he ALJ did not "adopt" Dr. Seu's
     opinion, but weighed it in accordance with the record as a whole exactly as
8              she is required to do.  Further, an ALJ is not required to accept every
     element of a medical source's opinion in order to give that opinion weight.
9              (citation omitted).  Dr. Seu was not privy to Dr. Wakefield's diagnosis of
     malingering; thus anything Plaintiff subjectively relayed to the doctor
10             about his alleged limitations is not reliable.  In any event, Dr. Seu's
     opinion is not inconsistent with the ALJ's conclusion that Plaintiff could
11             perform light work.

12   Defendant's argument is not persuasive.  First, while the court agrees that the ALJ did not

13   explicitly adopt Dr. Seu's assessed limitations, she certainly did so implicitly.  Given that the

14   ALJ's residual functional capacity finding mirrors Dr. Seu's finding in every way (save for Dr.

15   Seu's opinion that plaintiff required hourly breaks from standing or walking), it is obvious that

16   the ALJ gave Dr. Seu's opinion controlling weight.  This conclusion is supported by the ALJ's

17   discussion of the various ways in which Dr. Seu's opinion is consistent with the other evidence

18   of record.  The ALJ, however, provided no reasoning for not including a limitation to hourly

19   breaks from standing or walking in her residual functional capacity assessment.

20             Second, defendant's statement that Dr. Seu was not privy to Dr. Wakefield's

21   assessment of malingering is not supported by the record.  It is just as likely that Dr. Seu did in

22   fact know about Dr. Wakefield's assessment given that Dr. Wakefield examined plaintiff four

23   months before Dr. Seu.  Further, Dr. Wakefield assessed plaintiff's mental impairments whereas

24   Dr. Seu assessed plaintiff's physical impairments.  Thus, Dr. Wakefield's assessment of

25   malingering in the context of a psychological evaluation does not necessarily mean that plaintiff

26   was also malingering with respect to his more serious physical problems.  And, even if Dr.

1   Wakefield's assessment of malingering would impugn plaintiff's statements to Dr. Seu, and

2   thereby cast doubt on Dr. Seu's assessments, such reasoning would be for the ALJ to explore in

3   the first instance.  It is not for this court to substitute its own analysis for the ALJ's.

4           Finally, the court takes issue with defendant's contention that Dr. Seu's limitation

5   to hourly breaks from standing or walking "is not inconsistent with the ALJ's conclusion that

6   Plaintiff could perform light work."  Clearly, a limitation to hourly breaks from standing or

7   walking would constitute a non-exertional limitation because, though such a limitation does not

8   directly affect strength activities, it would restrict plaintiff's ability to perform the exertional

9   activities of standing and walking.  See Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).  Thus,

10  Dr. Seu's limitation to hourly breaks from standing and walking may in fact be inconsistent with

11  an ability to perform the full range of light work.  It would remain to be seen what a vocational

12  expert would say about such a limitation.

13          The court finds that the ALJ erred by silently rejecting Dr. Seu's limitation to

14  hourly breaks from standing or walking.  A remand is necessary to address this error.

15          2.      Dr. Chellsen

16      The ALJ discussed Dr. Chellsen's opinions as follows:

17      At the conclusion of the hearing, the undersigned referred the claimant for
        another psychiatric consultative examination, given the claimant's suspect
18      performance during the first psychiatric consultative examination.  The
        examination was conducted on March 26, 2008, . . . by John A. Chellsen,
19      Ph.D. . . .  At this examination, the claimant appeared to be far more
        cooperative and responsive than the first examination.  Dr. Chellsen
20      obtained significant personal and medical history information, including
        description of physical health problems, and current medications.  His
21      interaction was described by Dr. Chelllsen as pleasant and cooperative.
        His affective expression was mobile in range, superficial in intensity, and
22      appropriate to content.  The claimant's memory and attention span
        appeared to fall into the low-average range, but his judgment was intact,
23      and there were no apparent problems with impulse control.  His capacity to
        tolerate frustration appeared to be unimpaired.
24
        On testing, the claimant obtained a Full Scale IQ of 79, with Verbal IQ of
25      80 and Performance IQ of 81. . .  In summary, Dr. Chellsen found the
        claimant to have mild social and personal limitations and moderate
26      occupational limitations.  Dr. Chellsen opined that the claimant appears to

have functioned in a marginal and withdrawn fashion for many years. He has a significant degree of constriction in his range of activities and interests. His social skills are pro-social in nature but significantly under-developed. His task performance was characterized by good persistence and borderline to low-average pace and quality. His limited energy and capacity for exertion appear to be the primary factors which impair his ability to tolerate or adapt to usual work stressors or routines [Exhibit 16F].

As with Dr. Seu, the ALJ then went on to note that Dr. Chellsen's opinions were consistent with the other evidence of record. The ALJ concluded her discussion by saying that, taken at face value, Dr. Chellsen's report does not suggest that plaintiff is unable to perform unskilled work.

The court finds that the basis of plaintiff's argument concerning the ALJ's analysis of Dr. Chellsen's opinion – that the ALJ "tacitly rejected" the doctor's opinion – is incorrect. Contrary to plaintiff's reading of the hearing decision, the court finds that the ALJ in fact accepted Dr. Chellsen's opinions in concluding that ". . . the claimant has some mental impairment, but nothing that limits his ability to perform basic unskilled work." Further, there is nothing in Dr. Chellsen's report which suggests otherwise. While the doctor reported that plaintiff ". . .appears to have . . . moderate occupational limitations, strictly from a psychological point of view," he nonetheless concluded that plaintiff's limited energy and capacity for exertion were the ". . .primary factors which impair his ability to tolerate or adapt to usual work stressors or routines." In other words, it was Dr. Chellsen's opinion that plaintiff's physical impairments, and not any mental impairment, are the cause of any reduction in plaintiff's ability to work. This interpretation is consistent with the largely unremarkable findings noted by Dr. Chellsen, as well as plaintiff's stated bewilderment as to why he had been referred for a second psychological evaluation. The ALJ agreed.

The court finds no error with respect to Dr. Chellsen.

/ / /

/ / /

/ / /

**B.   Obesity**

In 1999, obesity was removed from the Listing of Impairments.[2]  Obesity may still enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181 n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to consider obesity in a multiple impairment analysis, but only where it is "clear from the record that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that a multiple impairment analysis is not required where "the medical record is silent as to whether and how claimant's obesity might have exacerbated her condition" and "the claimant did not present any testimony or other evidence . . . that her obesity impaired her ability to work").  Where a multiple impairment analysis is not required, the ALJ properly considers obesity by acknowledging the plaintiff's weight in making determinations throughout the sequential analysis.  See Burch, 400 F.3d at 684.

In a footnote on page 14 of plaintiff's brief, he argues that the ALJ erred by not conducting a multiple impairment analysis with respect to plaintiff's obesity.  The court does not find any error in this regard.  There is absolutely no evidence that plaintiff's weight contributes to or exacerbates any of his impairments.  Further, there is no evidence that plaintiff's weight adversely impacts his functioning in any way, and plaintiff has never complained that it does.

/ / /

/ / /

/ / /

/ / /

---

[2]     Under SSR 02-01p, a person with body mass index ("BMI") of 30 or above is considered obese.  BMI is the ratio of an individual's weight in kilograms to the square of height in meters (weight divided by square of height).

1       **C.      Residual Functional Capacity Finding**

2               Residual functional capacity is what a person "can still do despite [the

3   individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

4   Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

5   "physical and mental capabilities").  Thus, residual functional capacity describes a person's

6   exertional capabilities in light of his or her limitations.[3]  In determining residual functional

7   capacity, the ALJ must assess what the plaintiff can still do in light of both physical and mental

8   limitations.  See 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751

9   F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and

10  mental capabilities").  Where there is a colorable claim of mental impairment, the regulations

11  require the ALJ to follow a special procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The

12  ALJ is required to record pertinent findings and rate the degree of functional loss.  See 20 C.F.R.

13  §§ 404.1520a(b), 416.920a(b).

14              Plaintiff argues:

15                  As set forth above [in plaintiff's brief], the ALJ found that Mr.
        Johnson had the residual functional capacity to perform the *full* range of
16      light work even though the evidence established that Mr. Johnson had low
        average to borderline intellectual functioning; had difficulty reading;
17      needed to self administer breathing treatments every four hours for asthma,
        and had a football size hernia. . . .  Indeed, the ALJ specifically found that
18      Mr. Johnson suffered from the severe impairments of asthma, an
        unrepaired abdominal hernia, and low-average to borderline intellectual
19      functioning. TR 13.
                    The ALJ also found that Mr. Johnson's "medically determinable
20      impairments could reasonably be expected to produce the alleged
        symptoms" and the ALJ did not dispute or reject Mr. Johnson's testimony
21      that he had difficulty reading or needed to self-administer breathing
        treatments every four hours. TR 15-16.  In addition, the ALJ purported to
22      adopt Dr. Seu's and Dr. Chellsen's opinions regarding Mr. Johnson's
        residual functional capacity. TR 16, 18.  Nevertheless, the ALJ's RFC
23      assessment for the full range of light work failed to include Dr. Seu's

24  ──────────────

25          [3]     Exertional capabilities are the primary strength activities of sitting, standing,
    walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
    perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
26  P, Appendix 2, § 200.00(a).

1    finding that Mr. Johnson would require *hourly* breaks when standing and
     walking or Dr. Chellsen's opinion that he had *moderate* occupational
2    limitations, including borderline to low-average pace and quality. TR 203,
     299.
3               Consequently, the ALJ's assessed RFC was not consistent [with]
     Mr. Johnson's severe impairments or opinion evidence which the ALJ
4    purported to adopt.

5    Because the court finds that the ALJ erred with respect to Dr. Seu's opinion that plaintiff requires

6    hourly breaks from standing or walking, it is impossible to determine whether the ALJ's residual

7    functional capacity finding is accurate.  If Dr. Seu's limitation is properly rejected, then the

8    current residual functional capacity may still be correct.  If, however, Dr. Seu's limitation is

9    accepted, then the current residual functional capacity assessment would be deficient in that it

10   omits Dr. Seu's limitation.  The court finds that a new residual functional capacity assessment

11   must be made on remand following proper consideration of Dr. Seu's opinion that plaintiff

12   requires hourly breaks from standing and walking.

13           **E.**       **Application of the Grids**

14           The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

15   disability for various combinations of age, education, previous work experience, and residual

16   functional capacity.  The Grids allow the Commissioner to streamline the administrative process

17   and encourage uniform treatment of claims based on the number of jobs in the national economy

18   for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

19   460-62 (1983) (discussing creation and purpose of the Grids).

20           The Commissioner may apply the Grids in lieu of taking the testimony of a

21   vocational expert only when the Grids accurately and completely describe the claimant's abilities

22   and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

23   Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

24   Grids if a claimant suffers from non-exertional limitations because the Grids are based on

25   / / /

26   / / /

1    exertional strength factors only.[4]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

2    "If a claimant has an impairment that limits his or her ability to work without directly affecting

3    his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

4    by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

5    Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

6    even when a claimant has combined exertional and non-exertional limitations, if non-exertional

7    limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

8    1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

9           In cases where the Grids are not fully applicable, the ALJ may meet his burden

10   under step five of the sequential analysis by propounding to a vocational expert hypothetical

11   questions based on medical assumptions, supported by substantial evidence, that reflect all the

12   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

13   where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

14   ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

15   1341 (9th Cir. 1988).

16          As discussed above, the court finds that a limitation to hourly breaks from

17   standing or walking would constitute a non-exertional limitation precluding application of the

18   Grids.  But, as with the current residual functional capacity assessment, it is impossible to

19   determine whether the Grids are inapplicable absent proper consideration of the limitation opined

20   by Dr. Seu.  If it is determined on remand that Dr. Seu's limitation is indeed valid, then

21   vocational expert testimony should be elicited as to whether and to what extent such limitation

22   erodes the occupational base for work allowed by plaintiff's residual functional capacity.

23   / / /

24   ───────────────

25         [4]     Non-exertional activities include mental, sensory, postural, manipulative, and
       environmental matters which do not  directly affect the primary strength activities.  See 20
       C.F.R., Part 404, Subpart P, Appendix 2,   § 200.00(e).  Exertional capabilities are defined above

26   in footnote 3.

## V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 20) is granted;

2.      The Commissioner's cross motion for summary judgment (Doc. 26) is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.

DATED:  March 29, 2011

_Craig M. Kellison_
_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE